UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

KENTUCKY EMPLOYEES RETIREMENT
SYSTEM and the BOARD OF TRUSTEES
OF KENTUCKY RETIREMENT SYSTEMS,                    Appellants/Cross-Appellees,

v.                                                 Civil Action No. 3:15-cv-25-DJH

SEVEN COUNTIES SERVICES, INC.,                     Appellee/Cross-Appellant.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Kentucky's largest public pension fund appeals a ruling of the United States Bankruptcy Court for the Western District of Kentucky, which permits a community mental health provider to withdraw from participation in the pension. For decades, Seven Counties Services, Inc., a *private* behavioral health services provider, paid into Kentucky Employees Retirement System, a *public* pension system. Starting in 2013, the burden became too great—Seven Counties could not afford to pay both its Kentucky Employee Retirement System contributions and continue to provide its services. So it filed for Chapter 11 bankruptcy relief. Its goal was to leave KERS; KERS tried to bar Seven Counties' exit. The bankruptcy court decided that Seven Counties qualified for Chapter 11 relief, that its relationship with KERS was based on contract, and that it could reject that contract with KERS. KERS has appealed the decision. KERS also proposes that this Court certify a question to Kentucky's highest court. Meanwhile, Seven Counties has filed what it calls a "protective cross-appeal" to suggest alternative reasons to uphold the decision below if the Court decides the bankruptcy court was wrong to find that the parties' relationship was contractual. After careful consideration, the Court concludes that a certification to the Kentucky Supreme Court is unnecessary. As well, the Court will deny KERS's appeal and

1

uphold the bankruptcy court's decision with one correction to the bankruptcy court's factual conclusions.

## I.      FACTUAL BACKGROUND

There is only one significant objection[1] to the bankruptcy court's factual findings.  The Court will correct that factual error, but it will otherwise rely on the factual findings of the court below.  The following is a recitation of only those facts needed to understand the Court's decision.  For a more detailed account, see the bankruptcy court's thorough and well-drafted fact section.

### A.  The Transition to Private Providers of Behavioral Health Services

Historically, the states treated the mentally ill.  (Stayed Litigation Docket No. 6-1, PageID # 114)[2]  Often, that meant that the states institutionalized their wards.  This approach changed when President Kennedy signed the Community Mental Health Act in 1963.  (*Id.*)  The CMHA gave federal funds to help create community-based mental health centers, now called "CMHCs."  Since then, the states have taken a less direct role in treating mental and behavioral health issues, and fewer people with these ailments have been institutionalized.

After the CMHA became law, Kentucky began planning how to coordinate "public and private efforts" to provide mental health services.  (*Id.*, PageID # 120 (citing Ky. Exec. OR. 64-207 (Mar. 17, 1964)))  It had a plan by 1966, when twenty non-profit corporations were organized "to provide community mental health services in Kentucky."  (*Id.*)  To become a

---

[1] The parties agree that the bankruptcy court was wrong to call the retirement system at issue a "multi-employer plan."  (*See* Docket No. 19, PageID # 2967)  Instead, it is a "multiple-employer plan."  (*Id.*)  The distinction has to do with whether the plan is maintained pursuant to one or more collective bargaining agreements.  *See generally* 29 U.S.C. § 1002(37)(A)(ii).  It does not appear, however, that the distinction matters for the purposes of this Opinion.

[2] This litigation involves three cases.  Two of them have been consolidated to form this case.  The other, 3:15-cv-75-DJH, is currently stayed.  The Stayed Litigation's documents will be cited to as "S.L.D.N. _____."

CMHC in the state, an entity first had to be a non-profit incorporated under Chapter 273 of the Kentucky Revised Statutes and receive designation from the Kentucky Cabinet for Health and Family Services (the "Cabinet").  (*Id.*)  One of the first CMHCs to incorporate was Kentucky Region Eight Mental Health-Mental Retardation Board, Inc. ("Region Eight").  (*Id.*, PageID # 120-21)  Region Eight, later renamed "River Region," served the same counties—Jefferson and six surrounding counties—that Seven Counties now serves.  (*Id.*)  Today, only fourteen CMHCs operate in Kentucky, with each serving a specific geographic area of Kentucky.  (*Id.*)  Each one is a non-profit that is exempt from local, state, and federal income taxes.  (*Id.*)

Remember, these newly created CMHCs took over services that had previously been provided by the state.  (*Id.*)  Indeed, many people who went to work for the CMHCs had been employed by Kentucky state government, and they had earned credit towards their retirements through KERS.  (*Id.*)  As the state shifted services from public to private behavioral health services providers, many state employees made the necessary move to private employment with the CMHCs.  (*Id.*)  But this created a dilemma: The workers were reluctant to lose the benefits of state employment, including their pensions.  (*Id.*)  And so, Governor Edward T. Breathitt signed Executive Order 66-378 in June 1966.  (S.L.D.N. 6-1, PageID # 122)  The order rolled *all* CMHC employees—not just those who had previously worked for state government—into the Kentucky Retirement System (the "System").

Not all of the CMHCs wanted to participate in the System.  (*Id.*)  Three of them created tax-sheltered annuity retirement programs instead.  (*Id.*)  KERS sued those three CMHCs in Franklin Circuit Court to force their participation in the System, and the Franklin Circuit Court ruled for KERS.  (*Id*)  But in 1974 when the case reached the Kentucky Court of Appeals (then Kentucky's highest court), *see Ky. Region Eight v. Commonwealth*, 507 S.W.2d 489 (Ky. Ct.

3

1974), that court reversed the Franklin Circuit Court decision, deciding that the CMHCs did *not* have to participate in the system.  (S.L.D.N. 6-1, PageID # 122)  The Kentucky Court of Appeals' decision held that the CMHCs were not state agencies, their employees were not state workers, and the receipt of state grants or funds does not transform a private entity into a state agency. *Ky. Region Eight*, 507 S.W.2d at 490-91.

### B.  The Rise of Seven Counties

By 1978, River Region was struggling financially.  (S.L.D.N. 6-1, PageID # 123)  It tried to be adjudicated bankrupt.  (*Id.*)  The Cabinet's predecessor inserted itself into the bankruptcy proceedings as an interested party, asking the bankruptcy court not to adjudicate River Region bankrupt because, if River Region were bankrupt, its services would stop.  (*Id.*)  The state agreed to pay River Region's operating costs until August 1978, when the newly-formed Seven Counties could step in.  (*Id.*)

Some River Region employees challenged the entity's right to be declared bankrupt. (*Id.*)  They argued that River Region was an alter ego and surrogate of the Commonwealth.  (*Id.*, PageID # 124)  But that argument failed.  (*Id.*)  In January 1980, the bankruptcy court ruled that "River Region was not a state agency or instrumentality."  (*Id.* (citing *Greenberg v. River Region Mental Health-Mental Retardation Board, Inc.* (*In re River Region Mental Health-Mental Retardation Board, Inc.*), slip op. at *4, Case No. 78-00193-L (Bankr. W.D. Ky. Jan. 8, 1980)) The bankruptcy court's decision was based on several conclusions: first, that Kentucky did not control River Region's affairs; next, that any money River Region got from the state was for "contracted-for-services"; and last, that River Region's public function alone did not make it a state actor.  (*Id.*)  On appeal, this Court affirmed the *Greenberg* decision.  (*Id.* (citing *Greenberg v. River Region Mental Health-Mental Retardation Board, Inc.* (*In re River Region Mental*

4

*Health-Mental Retardation Board, Inc.*), Case No. 80-0089-L(B) (W.D. Ky. Sept. 11, 1980) (Ballantine, J.)))  Then in a *per curiam* opinion, the Sixth Circuit Court of Appeals affirmed Judge Ballantine's conclusion that River Region was not a state agency or instrumentality.  *See Halikas v. River Region Mental Health-Mental Retardation Board, Inc*, Case No. 80-5433 (6th Cir. Oct. 22, 1981).

Meanwhile, in June 1978, the Cabinet's predecessor decided to make Seven Counties the successor to River Region.  (*Id.*, PageID # 126)  The three entities—River Region, Seven Counties, and the Cabinet's predecessor—worked together closely during River Region's bankruptcy to keep mental health services available in the region.  (*Id.*)  Seven Counties took over in August 1978.  (*Id.*, PageID # 127)  By 1982, River Region had ceased to exist as a corporate entity.  (*Id.*, PageID # 126)

Today, Seven Counties provides behavioral health services to some 33,000 people in Jefferson and the six surrounding counties.  (*Id.*, PageID # 114)  It is a non-profit entity with "no shareholders or members."  (*Id.*)  All of its profits go to its maintenance.  (*Id.*)  If it were ever to be dissolved, its governing documents stipulate that any remaining assets are to be distributed to charitable organizations.  (*Id.*)

A board of directors runs Seven Counties.  (*See id.*, PageID # 128)  The Board's membership "is self-perpetuating, and the membership . . . is determined by a majority vote of the Seven Counties Board of Directors."  (*Id.*)  When there is a vacancy, a "nominating committee," which is made up of the Board's secretary and five other Board members the secretary appoints, presents possible new members to the Board.  (*Id.*)  No representative of Kentucky state government has ever had "the power to select members of the [B]oard."  (*Id.*, PageID # 129)  Likewise, the Board can, by majority vote, remove any member with or without

cause, but no one outside the Board may remove a director.  (*Id.*)  A representative of the Cabinet's Department for Behavioral Health, Development and Intellectual Disabilities[3] attends the Board's meetings.  The Department's representative is not, however, a Board member, nor does he have a vote.  (*Id.*, PageID # 129-30)  Indeed, the Department's recent representative, Lou Kurtz, acknowledged during the proceedings below "that when the Board goes into executive session, he leaves the meeting."  (*Id.*, PageID # 130)  The Board hires Seven Counties' chief executive officer, and the CEO is responsible for hiring other officers and employees.  (*Id.*, PageID # 130-31)  Kentucky state government plays no role in the hiring of Seven Counties' staff.  (*Id.*, PageID # 131)  These facts all demonstrate that though the Kentucky state government depends upon Seven Counties' operations, Seven Counties has a recognized and legal independence from the state.

### C. The State's Involvement with the CMHCs

The Cabinet is the primary source of funds for all CMHCs.  (*Id.*, PageID # 132)  The funds come either from Medicaid or "through general fund dollars sent to" the Department for Behavioral Health.  (*Id.*)  The Cabinet has oversight over the CMHCs' "annual plans and budgets."  (*Id.*)  CMHCs must provide the Cabinet with "accountable outcome data" about the services they provide.  (*Id.*)

The Cabinet must also "designate" the CMHCs.  (*Id.*)  This means that the Cabinet reviews the CMHC's bylaws, board composition, and operations to determine whether they meet

---

[3] For clarity's sake, it is helpful to reiterate the chain of command here.  At the head of Kentucky's executive branch is its governor.  The rest of the executive branch is made up of "cabinets"—administrative bureaucracies similar to the federal system's "departments" (like the Department of Labor, Treasury, and so on).  Kentucky's cabinets have within their purview even smaller administrative bureaucracies called "departments."  This Opinion is concerned only with Kentucky's Cabinet for Health and Family Services, which oversees the Department for Behavioral Health, Development and Intellectual Disabilities, which in turn regulates CMHCs, including Seven Counties.

minimum standards.  (*Id.*)  CMHCs must also comply with certain statutes.  (*Id.*)  Once designated, CMHCs are eligible to receive significant contracts from the Cabinet.  (*Id.*, PageID # 133)  The Cabinet pays the CMHCs only through contracts; the CMHCs receive no direct appropriations from the state legislature.  (*Id.*)

Seven Counties' relationship with the state—like the relationships between all the CMHCs and the state—is voluntary.  (*Id.*)  Each year, Seven Counties must ask the Cabinet for authorization to continue serving as the CMHC for its region.  (*Id.*)  The recognition qualifies Seven Counties to bid for state contracts for which it would not otherwise be eligible; in exchange, Seven Counties submits itself to "extensive regulatory oversight."  (*Id.*)  So Seven Counties and the other CMHCs could still exist without the Cabinet's designation, "but would operate on a much smaller scale."  (*Id.*, PageID # 134)  Among other requirements, CMHCs must set term limits on directors, "comply with the Civil Rights Act of 1964," hold at least twelve board meetings each year, and maintain certain standing committees.  (*Id.*, PageID # 135)

Of course, the Cabinet's most significant leverage over a CMHC is its ability to "de-designate" its recognition of a CMHC.  (*Id.*)  In severe cases, emergency provisions allow the Cabinet "to take control of a CMHC much as the Cabinet undertook with River Region on a temporary basis to ensure patient care during the transition [from River Region to Seven Counties]."  (*Id.* (citing KY. REV. STAT. § 210.440)  These emergency powers are narrow: The Cabinet must give notice of its intent and the CMHC may request a hearing.  (*Id.*)  Yet despite the Cabinet's authority to de-designate, there is "no provision in the statutes or regulations . . . for the Cabinet to dissolve or terminate the corporations serving as CMHCs or to take title of a CMHC's assets in the event of de-designation."  (*Id.*)

The bankruptcy court analyzed in detail how the Commonwealth treats Seven Counties. (*See id*., PageID # 136-39)  It found that Kentucky treats Seven Counties primarily like a private entity, even though it is treated as a "public agency" for some limited purposes, such as the obligations imposed by the Kentucky Open Records Act.  (*Id*., PageID # 136-37)  For one, Seven Counties must apply and pay for "permits and licenses from the state to operate its business." (*Id*., PageID # 136)  As well, the Kentucky General Assembly does not appropriate any money to Seven Counties; the only money Seven Counties receives from the state comes from contracts for services.  (*Id*.)  Historically, Kentucky and its agencies have acknowledged that the CMHCs are private entities.  (*Id*., PageID # 139)  In 1981, the general manager of Kentucky Retirement Systems ("KRS") responded to a CMHC letter of inquiry and stated that the CMHCs had always been private.  (*Id*.)  Though Seven Counties, like all CMHCs, is subject to regulatory oversight, neither Kentucky nor any of its agencies has day-to-day control over Seven Counties.  (*Id*., PageID # 155)  And Kentucky's secretary of state has twice revoked CMHC corporate charters for failure to make required annual reports.  (*Id*., PageID # 139)  The bankruptcy court also rejected the theory that Seven Counties is a "special purpose government entity" under Ky. Rev. Stat. § 65A.010(8)(d).  (*Id*., PageID # 138)

## D.  Seven Counties, the Kentucky Employee Retirement System, and Funding Woes

The General Assembly created KERS in 1956.  (*Id*., PageID # 139)  "Its purpose is to provide a secure means of retirement savings for state government employees."  (*Id*.)  The General Assembly created KRS in the same year.  (*Id*.)  KRS is an "agency" of Kentucky's executive branch that administers three of Kentucky's retirement systems, including KERS.  (*Id*., PageID # 139-42)  KERS has a hazardous and non-hazardous "plan."  (*Id*., PageID # 140)

Though they are called "plans," they are actually "tiers within a single defined benefit plan." (*Id*.)  Seven Counties participates in the non-hazardous tier.  (*Id*.)

Each of the three KRS-administered systems is a trust funds held and applied solely for the benefit of the members.  (*Id*.)  As of June 2013, a total of 127,576 members participated in KERS.  (*Id*.)  Some private employers contribute to KERS, but employers that "are integral parts of state government" have their contributions paid by appropriations from the General Assembly. (*Id*., PageID # 141-42)  Seven Counties has never enjoyed this status; KERS does not claim, and, indeed, nothing in the record suggests that Seven Counties' contributions to KERS have ever been funded by general appropriations from the General Assembly.  Employer contributions comprise "normal costs," which are the costs of funding the benefits earned each year, and the "amount needed to fund the actuarially accrued liability amortized over a fixed period of thirty years" starting in June 2013.  (*Id*., PageID # 143)  KRS adopts an employer contribution rate "that represents the actuarially required contribution rate (the 'ARC')."  (*Id*.)  But it is really the General Assembly that sets the rate in the budget.  (*Id*.)  When Seven Counties filed for bankruptcy protection, the KERS employer contribution rate was 23.61% of each employee's creditable compensation.  (*Id*.)  Employees also contribute five percent of their creditable compensation to KERS.  (*Id*., PageID # 142)  Employees who started after September 1, 2008, though, make an additional one percent health insurance contribution.  (*Id*.)  The employee contributions are "picked up" by employers—that is, they are withheld before tax.  (*Id*.)

KERS is a defined benefit plan.  (*Id*., PageID # 143)  This means that each retiree's annual benefits are determined by multiplying final compensation, the "benefit factor," and the retiree's years of service.  (*Id*., PageID # 143-44)  Defined benefit plans—as opposed to defined contribution plans—are "at risk for underfunding" because they are limited to the return on

investments from employer and employee contributions, but the benefits paid to pensioners are not so limited. (*Id.*, PageID # 144)  This is why the ARC is so important: "The solvency of the fund to meet future retirement obligations is dependent upon consistent payment of the ARC." (*Id.*)  When contributions are less than the ARC, it almost guarantees that the fund will be unable to fully pay future retiree benefits. (*Id.*)

It does not take an expert to conclude that KERS's non-hazardous plan is in poor shape. (*See id.*)  As recently as the year 2000, the non-hazardous plan was 100% funded. (*Id.*)  Since then, though, there has been a decline in funding for three reasons. (*Id.*)  First, market losses in 2000-2001 and 2008-2009 diminished the fund's asset values by 17%. (*Id.*)  Second, the General Assembly approved increased retirement benefits to keep up with inflation without providing additional appropriations to fund the increase. (*Id.*)  Last, and most important, the General Assembly has consistently failed to require contribution rates commensurate with the ARC. (*Id.*)  Indeed, when the bankruptcy court issued its order in 2014, the General Assembly had failed to set an employer contribution rate meeting the ARC in fifteen of the previous twenty-two years. (*Id.*, PageID # 143)  Despite this dubious track record, the General Assembly did make recent changes to Ky. Rev. Stat. § 61.565(3)(c) and (5) to require funding the full ARC rate going forward. (*Id.*)  That change took effect with the beginning of Kentucky's 2015 fiscal year, July 2014. (*Id.*)  Of course, these changes had other consequences—like the insolvency of Seven Counties—that led to this case.

Defined benefit plans are, by their nature, vulnerable to legislative underfunding.  The Commonwealth's decision to open KERS to private employers put the system at even greater risk. (*Id.*)  As mentioned above, Kentucky extended KERS's coverage to private entities in the 1960s to help transition from public to private mental health service providers.  But the 1966

expansion also covered employees who did *not* transition from public employment.  (*Id*.)  That is, Kentucky took on the risk of paying "for future retiree benefits to employees who never worked for the state."  (*Id*., PageID # 145)  Actions have consequences: opening the system to private employers only increased the risk of nonpayment, which, in turn, increased the risk that the system would be underfunded.  (*Id*., PageID # 144)  And private employers—unlike the Commonwealth of Kentucky—can fail and cease to exist; KRS cannot "force a private entity to pay employer contributions if it cannot afford to stay in business."  (*Id*., PageID # 145)

That is the predicament Seven Counties and KRS now face.  When the General Assembly passed Senate Bill 2—the amendment to Kentucky's statutes that now requires the General Assembly to demand private employers in KERS meet the ARC—the contribution rates for CMHCs were raised to, but capped at, 24%.  (*Id*., PageID # 143)  The 24% cap was a special carve-out for CMHCs; other employers had their rates go up to almost 27% beginning July 2013.  (*Id*., PageID # 143-46)  Historically, before the rate was raised to 24% for CMHCs, Seven Counties was able to pay its employer contributions "because the rate had been manageable."  (*Id.*, PageID # 146)  Indeed, if the 1966 KERS expansion had been limited to employees transitioning from state government, Seven Counties would still be able to afford its contributions.  (*Id*.)  Instead, when Senate Bill 2 was enacted in 2013, "Seven Counties was rendered insolvent."  (*Id*.)  Even capped at the 24% carve-out for CMHCs, Seven Counties cannot afford to both pay its contributions and render its services.  (*Id*.)  The bankruptcy court crunched the numbers: At 24% cap, Seven Counties' employer contributions would sap more than two-thirds of Seven Counties' gross revenues, leaving it with insufficient funds to provide its services.  (*See id*.)  After Senate Bill 2, Seven Counties can either pay its contributions or live up to its mission.  "It cannot do both."  (*Id*.)  Even if the Court were to decide that the applicable

11

law required Seven Counties to continue its participation in KERS—which would shutter Seven Counties—the practical result would be the same: whether it leaves the system or remains, Seven Counties will not be able to pay its required contributions.  (*See id.*, PageID # 154)

The Court recognizes that the plan's health will suffer from the loss of Seven Counties. At the start of these proceedings, Seven Counties accounted for 2.53% of the total membership in the KERS non-hazardous tier, and 3.32% of all employer contributions.  (*Id.*, PageID # 150)

### E.  The Looming Crisis

Thomas Cavanaugh is KERS's outside actuary.  (*Id.*, PageID # 151)  His job is to calculate KERS's future liability and the actuarial value of KERS's assets, "which allows him to calculate a contribution rate" that transcends market fluctuations.  (*Id.*)  The difference between those two values is KERS's unfunded liability.  (*Id.*, PageID # 151-52)  The size of the unfunded liability "has exploded."  (*Id.*, PageID # 152)  There are several reasons for the "explosion."  The most obvious cause is the General Assembly's serial underfunding.  (*Id.*)  Additionally, the value of the assets dropped in 2000-2001 and 2008-2009 because of unstable markets.  (*See id.*)  And changing demographics have also played a role.  (*Id.*)  The result is that the system "does not have nearly enough money to meet its needs to pay expected benefits."  (*Id.*)  In June 2013, the KERS non-hazardous plan had racked up total liabilities of about $2.5 billion; of the total liabilities, about $1.6 billion was unfunded, even after accounting for prospective employer and employee contributions.  (*Id.*)  In sum, only 23.4% of the non-hazardous plan is actually funded. (*Id.*)  This means that, as of 2013, the state pension system had less than a quarter of the funding necessary to meet its future obligations.

The unfunded liability is especially worrisome because, in 1972, the General Assembly changed the law to make KRS an "inviolable contract."  (*Id.*, PageID # 161 (citing KY. REV.

STAT. § 61.692))   That is, the laws governing Kentucky's pension system recognize an agreement between the members of KERS and the state.   That agreement prevents the General Assembly from reducing or impairing "by altercation, amendment, or appeal," the benefits the pensioners earn over their terms of employment.   (*Id.* (citing KY. REV. STAT. § 61.692; *Jones v. Bd. of Trs. Of Ky Ret. Sys.*, 910 S.W.2d 710, 711 (Ky. 1996)))   Perhaps recognizing the magnitude of the impending shortfall, however, the General Assembly in Senate Bill 2 changed the laws again to allow the legislators to "amend, suspend, or reduce" the retirement benefits of any state workers who began participating after January 2014 if "the welfare of the Commonwealth so demands." (*Id.*, n.12)

Because the KERS non-hazardous plan is a defined benefit plan, "there is no accounting for the contributions by the employer." (*Id.*, PageID # 152)   All employer contributions are commingled. (*Id.*)   Still, Seven Counties presents unique actuarial considerations.   Its employees tend to be younger on average and tend to have less service time on average than the typical member of the KERS non-hazardous plan, which means Seven Counties has a "lower accrued liability" compared to other employers in the system. (*Id.*)   Seven Counties' employees earn more money than the average plan participant, but they also end up with lower retirement benefits on average. (*Id.*, PageID # 153)   Cavanaugh says this paradox is due to a higher turnover rate in the medical field. (*Id.*)   These factors together mean that "the cost structure or the demographic profile" of Seven Counties' employees is lower than average for the non-hazardous plans. (*Id.*)   But because all employers pay the same rate, Seven Counties must "pay more proportionally" than those with higher cost structures. (*Id.*)   If Seven Counties had its own plan, its contribution rates—as well as its employees' rates—would be lower than in KERS. (*Id.*)

Another effect of the cost-sharing nature of the defined benefits plan is that, when a contributing employer leaves the plan, the burden falls on the remaining members to fill the void. (*Id.*)  Cavanaugh calculated that if Seven Counties stopped participating in fiscal year 2015, the employer contribution rate would need to rise from 38.77% to 39.56% to meet the ARC.  (*Id.*)  In fiscal year 2033, the contribution rate with Seven Counties would be 33.49%, but without Seven Counties, the rate would climb to 36.24%.  (*Id.*)  Clearly, the departure of private-employer participants such as Seven Counties will add to the burden on the system.

**F.  Procedural History**

Seven Counties filed for Chapter 11 bankruptcy protection in April 2013.  (D.N. 15, PageID # 2091)  The primary purpose of the bankruptcy petition was to seek relief from its KERS obligations.  (*Id.*)  Seven Counties sought an order from the bankruptcy court rejecting its "executory contract, if any exists, between [Seven Counties] and KERS."  (*Id.* (citations omitted))  KERS objected to that motion.  (*Id.*)

 Seven Counties then filed an adversary proceeding.[4]  (*Id.*)  It asked the bankruptcy court to declare either that (1) it was ineligible to participate in KERS, or (2) that KERS was not a governmental plan, which would permit Seven Counties to withdraw under the Employee Retirement Income Security Act.  (*Id.*, PageID # 2092)  KERS said the action should be dismissed because of sovereign immunity, but the bankruptcy court disagreed.  (*Id.*)  KERS appealed.  That action (case number 3:14-cv-00189-JHM) is in abeyance pending resolution of the issues currently before the Court.  (*Id.*)

---

[4] In bankruptcy court, an adversary proceeding is a "lawsuit that is brought within a bankruptcy proceeding, governed by special procedural rules, and based on conflicting claims usually between the debtor (or the trustee) and a creditor or another interested party."  BLACK'S LAW DICTIONARY 64 (10th ed. 2014).  A party in interest, including a creditor, "may raise and may appear and be heard on any issue in a case under" Chapter 11.  11 U.S.C. § 1109.

In June 2013, KERS also filed an adversary proceeding. (*Id*.) Its action focused on two issues. First, KERS argued that Seven Counties was a "governmental unit" under the Bankruptcy Code, which would make it ineligible for Chapter 11 relief. (*Id*. (citing 11 U.S.C. § 101(27))) Finally, KERS wanted to force Seven Counties to perform its statutory obligations to KERS during the bankruptcy proceedings. (*Id*.) KERS requested a preliminary injunction; the bankruptcy court conducted an evidentiary hearing on the requested injunction but ultimately denied the motion and ordered that the evidence from the hearing be put into the trial record. (*Id*.) The case was tried in March 2014. (*Id*., PageID # 2093) Bankruptcy Judge Joan Lloyd issued an opinion in May 2014 concluding that Seven Counties' participation in KERS was based on an unwritten executory contract; that Seven Counties did not need to comply with its obligations to KERS after petitioning for bankruptcy; and that Seven Counties is not a "governmental unit" under the Bankruptcy Code and thus can file for Chapter 11 relief and reject its contract with KERS. (*Id*.) KERS appealed. The appeal is the basis of this Memorandum Opinion.

## II.     STANDARD

*Review of Bankruptcy Court's Decision on Appeal*

On appeal, this Court will review the bankruptcy court's conclusions of law de novo. *In re Isaacman*, 26 F.3d 629, 631 (6th Cir. 1996). That is, the Court will consider questions of law as though it were the original trial court. *Razavi v. Comm'r of Internal Revenue*, 74 F.3d 125, 127 (6th Cir. 1996). The Court will reverse findings of fact, however, only if they are clearly erroneous. Fed. R. Civ. P. 52(a)(6). When there are mixed questions of fact and law, the Court will review them de novo. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999).

15

*Certification of Question to State Court*

When presented with questions of Kentucky state law that may decide a case, and when it appears that there is no binding precedent from the Kentucky Supreme Court or Court of Appeals, then this Court may certify those questions of Kentucky law to the Kentucky courts. Ky. R. Civ. P. 76.37.  The decision to certify is, however, up to this Court's discretion.  *Transam. Ins. Co v. Duro Bag Mfg. Co.*, 50 F.3d 370, 372 (6th Cir. 1995).  Certification is "most appropriate when the question is new and state law is unsettled."  *Ky. Press Ass'n, Inc. v. Kentucky*, 355 F. Supp. 2d 853, 863 (E.D. Ky. 2005) (quoting *Transam. Ins.*, 50 F.3d at 372)).

## III.   DISCUSSION

The Court turns first to KERS's request to certify a question to the Kentucky Supreme Court.  For the reasons that follow, the Court will decline to certify the proposed question. Instead, the Court will address the issues the parties raised on appeal and explain its decision to affirm the bankruptcy court's ruling.

### A.  Certification to Kentucky Courts

The question KERS seeks to certify is direct: is Seven Counties' participation "as a department in" KERS based on contract or statutes?  (D.N. 25, PageID # 3893)  KERS gives several arguments as to why certification is needed.  (*Id.*, PageID # 3902-21)  Yet its position depends most on its view that this is an open question of Kentucky state law whose answer is important to Kentucky.  (*Id.*)

There is no need to certify a question to the Kentucky Supreme Court.  Certification is a tool meant to give this Court "guidance from a court to which [it is] bound to defer on issues of state law."  *Rutherford v. Columbia Gas*, 575 F.3d 616, 623 (6th Cir. 2009).  In some situations, certification can save the Court "time, energy, and resources and help build a cooperative judicial

federalism." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 77 (1997) (citations omitted; internal quotations omitted).  Other courts have certified questions when, for example, the case presents issues of particular importance to the state.  *In re Beverly Hills Fire Litig.*, 583 F. Supp. 1163, 1165 (E.D. Ky. 1984) (certifying a question "of utmost concern to Kentucky and its courts").  Certification is not obligatory, even if there is doubt regarding a state law.  *Gascho v. Global Fitness Holdings, LLC*, 918 F. Supp. 2d 708, 713 (S.D. Ohio, 2013) (citing *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974)).  Whether to certify a question to the Kentucky Supreme Court is within this Court's discretion.  *Lehman Bros.*, 416 U.S. at 391.  In this case, certification to the state court is neither needed nor likely to be of much help.

KERS's main argument for certification is the importance of these issues to Kentucky. The Court fully recognizes that this case's resolution will be important to Kentucky—regardless of the outcome.  Nevertheless, the time, energy, and resources of the federal courts have already been spent on this case; thus, the efficiency concerns described in *Arizonans for Official English* carry little sway.  KERS argues that "[t]here does not appear to be any caselaw from the Supreme Court of Kentucky or Kentucky Court of Appeals that addresses the fundamental question of Kentucky law raised by the [bankruptcy court opinion]: whether Seven Counties' participation is based on statutory authorization and executive order, or by an implied contract." (D.N. 25, PageID # 3902)

But the Court agrees with Seven Counties' position that KERS has presented the issue as a false dichotomy.  (*See* D.N. 26, PageID # 3936)  In briefing, KERS consistently framed this issue as an "either-or" proposition.  (*See, e.g.*, D.N. 25, PageID # 3902)  That is, KERS has presented the issue as either (1) Seven Counties took part because of statutes, or (2) it took part because of a contract.  But as this Court has already indicated, "[t]he bankruptcy court did not

17

find that KERS and Seven Counties had a contract outside of the statutory framework; rather, it concluded that they had formed a contract that was governed by those statutes." *Ky. Emps. Ret. Sys. v. Seven Counties Servs., Inc.*, Civil Action No. 3:15-cv-75-DJH, 2015 W.L. 474311, at *3 (W.D. Ky. Feb. 4, 2015). KERS admits that statutes *can* create contractual obligations. (D.N. 27, PageID # 3959-60) KERS would of course acknowledge that Kentucky courts have addressed issues of contract interpretation and enforcement. *See, e.g., Hazard Coal Corp. v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010) ("[T]he construction and interpretation of a contract . . . are questions of law to be decided by the court." (citations omitted)). The Court is able to consider the issues of this case and decide whether or not the statutes that govern these transactions were effectively the terms of an implied contract without need of certifying a case to Kentucky courts. The motion to certify a question to the Kentucky Supreme Court will therefore be denied.

### B.  The Appeals from the Bankruptcy Court's Decision

After trial, the bankruptcy court ruled in favor of Seven Counties. (S.L.D.N. 6-1) The bankruptcy court made three main conclusions. First, Seven Counties is not a "governmental unit," but is a "person" under the Bankruptcy Code, so it may seek Chapter 11 bankruptcy relief. Next, Seven Counties was not obligated to keep contributing to KERS after it began its bankruptcy proceedings. Last, Judge Lloyd concluded that there was an executory contract between Seven Counties and KERS that Seven Counties could reject under Chapter 11.

KERS appealed the decision in briefing that was, at times, needlessly pointed.[5] (*See* D.N. 15, PageID # 2093) First, KERS argued that there was no evidence of a contract between it and

---

[5]  In briefing, counsel for KERS made disrespectful comments about the bankruptcy court. Among other remarks, counsel said that the bankruptcy court was "[g]rasping for any straw," and

Seven Counties.  (D.N. 15, PageID # 2093)  Even if there was a contract, KERS argued the contract was not executory—that is, Seven Counties could not reject it in Chapter 11 bankruptcy. (*Id.*)  Next, KERS argued that the bankruptcy court erred when it decided that Seven Counties was not a "governmental unit."  (*Id.*, PageID # 2094)  It contends that the bankruptcy court's error included two flawed interpretations of Kentucky law.  (*Id.*)  Finally, KERS takes issue with the bankruptcy court's statement that the system is a "multi-employer cost-sharing defined benefit state plan."  (*Id.* (citing, *e.g.*, S.L.D.N. 6-1, PageID # 143))  KERS argues that the classification of the KERS non-hazardous plan was not properly before the bankruptcy court; moreover, KERS claims that the bankruptcy court's conclusion as to the type of plan was "plainly wrong."  (*Id.*)

For its part, Seven Counties supports the bankruptcy court's finding.  (D.N. 19)  It does make at least one concession, though: Seven Counties agrees that the bankruptcy court was wrong when it labelled the system a "multi-employer plan"; it is actually a "multiple-employer plan."  (D.N. 19, PageID # 2967)  Seven Counties doubts that this distinction will matter for purposes of this appeal, but KERS suggests that an erroneous classification of the type of system at issue could negatively affect future aspects of the litigation.  (*Id.*; D.N. 23, PageID # 3790)

Seven Counties also filed a "protective cross-appeal" that gives alternative reasons to uphold the bankruptcy court's decision.  (D.N. 17)  KERS retorts that it is improper for the Court to consider the cross-appeal.  (*See* D.N. 20)  Yet Seven Counties maintains that the Court may consider those arguments if it finds that the bankruptcy court's ultimate conclusion was correct but its reasoning was flawed.  (*See* D.N. 22)

---

"obtusely" reaching conclusions.  (*See, e.g.,* D.N. 15, PageID # 2118, 2120)  This approach was unnecessary and unwarranted.

The Court will uphold the bankruptcy court's decision.   The Court finds that Seven Counties qualifies for Chapter 11 relief, that Seven Counties was not required to continue paying its obligations during these proceedings, that there was an executory contract between KERS and Seven Counties, and that Seven Counties may reject that contract.   The Court will, however, correct the bankruptcy court's flawed description of the plan as "multi-employer."

### 1.   Seven Counties Qualifies for Chapter 11 Bankruptcy Relief

The Court first considers whether Seven Counties may seek Chapter 11 relief.   The bankruptcy court thought so.   (*See, e.g.,* S.L.D.N. 6-1, PageID # 115-16)   Chapter 11 states that "only a person" may qualify as a debtor under its provisions.   11 U.S.C. § 109(a).   The definitions section dictates that "'person' includes individual, partnership, and corporation," but it specifically says that "governmental unit(s)" are not included, with a few exceptions.   11 U.S.C. § 101(41).   Seven Counties is a "person," because it is a non-profit corporation under Kentucky law.   So it should qualify for Chapter 11 relief *unless* it is excludable as a "governmental unit."   Under the bankruptcy code, a "governmental unit" is:

> [The] United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

11 U.S.C. § 101(27).

To begin, Seven Counties could be considered a governmental unit only if it qualifies as a "department, agency, or instrumentality" of the federal government, Kentucky, or a municipality. After much discussion, Judge Lloyd ruled out each of those possibilities and concluded that Seven Counties was not a governmental unit.   (*See* D.N. 6-1, PageID # 164-77)   On appeal, KERS remained silent on whether Seven Counties is a department or an agency, so the Court

will treat its silence as a concession that neither label applies here.  Instead, KERS argues that Seven Counties is an instrumentality of Kentucky.  (D.N. 15, PageID # 2125-2133)  The Court disagrees.

Congress did intend for "governmental unit" to be defined broadly.  (*See* S.L.D.N. 6-1, PageID # 164 (citing S. Rep. No. 95-989, at 24 (1979)))  And "instrumentality" is not defined in the code, which leaves its meaning open to interpretation.  When construing a term in a statute, the Court first looks to the word's plain meaning.  *See United States v. Clarke*, 445 U.S. 253, 254 (1980).  *Black's Law Dictionary* carries two definitions of "instrumentality": (1) "A thing used to achieve an end or purpose"; and (2) "A means or agency through which a function of another entity is accomplished, such as a branch of a governing body."  BLACK'S LAW DICTIONARY 919 (10th ed. 2014).  As Judge Lloyd stated, these definitions could plausibly be read to include Seven Counties.  (S.L.D.N. 6-1, PageID # 170)  However, as she also noted, the other courts that have addressed cases similar to this one have held that the word's plain meaning is unhelpful for determining what qualifies as an "instrumentality of the state" under the Bankruptcy Code.  (*Id.* (*see also, In re Hosp. Auth. of Charlton Co.*, No. 12-50305, 2012 WL 2905796, at *5 (Bankr. S.D. Ga. July 3, 2012)))[6]  In this regard, the legislative history does provide some guidance:

> "Department, agency, or instrumentality" does not include an entity that owes its existence to state action, such as the granting of a charter or a license but that has no other connection with a state or local government or the federal government. The relationship must be an active one in which the department, agency, or instrumentality is actually carrying out some governmental function.

---

[6] Ironically enough, KERS uses *In re Hospital Authority* to imply that the plain meaning of "instrumentality" should carry the day.  (*See* D.N. 15, PageID # 2125 (where KERS cites *In re Hospital Authority* for the proposition that courts first consider the plain meaning, then declares that "[u]nder a plain meaning analysis, Seven Counties is an instrumentality of the Commonwealth."))   The problem with that implication, of course, is that the very case upon which KERS relies plainly states that "dictionary definitions of 'instrumentality' are too general to be instructive," and that even after consulting the legislative history, the "definition of 'instrumentality' remains vague."  *In re Hosp. Auth.*, 2012 WL 2905796, at *5.

S. Rep. No. 95-989, at 24 (1979).  That paragraph provides much fodder for discussion.

No reasonable person would disagree that Seven Counties "owes its existence to state action," at least in part.  Again, it took an act of Congress, and steps taken by Kentucky's executive branch, to transition mental and behavioral health in Kentucky from state control to private providers.  And there is certainly an ongoing relationship between Seven Counties and the state—Seven Counties is regulated by the state, and much of Seven Counties' revenue is derived from contracts with the state.  Yet the question remains whether the relationship between the two is "active" and whether Seven Counties is "carrying out some governmental function."

To answer these questions, Judge Lloyd looked to *Las Vegas Monorail*, 429 B.R. 770 (Bankr. D. Nev. 2010).   In that case, Nevada's bankruptcy court found that the non-profit corporation running Las Vegas' monorail system was neither an "instrumentality of the state" nor a "municipality," which, for purposes of the Bankruptcy Code, meant that the non-profit qualified for relief under Chapter 11 but not Chapter 9 (the chapter that provides relief for municipalities).  The Nevada court examined other areas of the Bankruptcy Code to help give meaning to the use of "instrumentality" in § 101(4).  *See id.* at 788.  After comparing the listed components of "instrumentality" in the Bankruptcy Code with the Code's use of "municipality," the Nevada court saw that "three distinct threads" emerged.  *Id.*  First, does the entity in question have powers "typically associated with sovereignty"?  Those powers include "eminent domain, the taxing power [and] sovereign immunity."  *Id.*  Next, if the entity does not have the powers of the state or only weak versions of them, does the entity have a public purpose?  *Id.*  If so, the more control the state has over the entity's "day-to-day activities, the more likely the entity is an instrumentality."  *Id.*  Last, how does the state designate and treat the entity?  *Id.*  Judge Lloyd

adopted these criteria when she weighed whether Seven Counties was a governmental unit. After detailed analysis, she concluded it was not.  (S.L.D.N. 6-1, PageID # 170-77)

Before looking to Judge Lloyd's analysis, the Court first turns to KERS's objection to Judge Lloyd's use of the old River Region cases[7] and *Las Vegas Monorail*.  (*See* D.N. 15, PageID # 2127-28)  KERS posits that when Judge Lloyd considered those cases, she improperly conflated the terms "municipality" and "governmental unit."  The River Region cases, KERS notes, were tried before the Bankruptcy Code even contained the term "governmental unit," so those decisions turned on whether the CMHCs were municipalities.  (*Id*., PageID # 2127)  And the factors *Las Vegas Monorail* used to decide whether an entity was a governmental unit were originally meant to decide whether something was a municipality.  (*Id*. at 2128)

To make its point, KERS turns again to *In re Hospital Authority*.  (*Id*.)  But this reliance is misplaced.  The *In re Hospital Authority* court did caution that "[t]he definition of 'governmental unit' is broader than the definition of 'municipality.'"  2012 WL 2905796 at *6.  However, that court also reached this conclusion: "Nonetheless, I find that the factors identified by the *Las Vegas Monorail* court are relevant in determining whether an entity is a governmental unit."  *Id*.  Then the court examined the entity in question through the lens of the three *Las Vegas Monorail* factors.  *Id*., at *6-*9.  KERS tries to play this off by saying that the *In re Hospital Authority* court applied the factors "in some sense," (D.N. 15, PageID # 2128), but that suggestion is disingenuous—the court fully considered and applied the *Los Vegas Monorail* factors.

---

[7] *Greenberg v. River Region Mental Health-Mental Retardation Bd., Inc. (In re River Region Mental Health-Mental Retardation Bd., Inc.)*, Case No. 78-00193-L (Bankr. W.D. Ky. Jan. 8, 1980), *aff'd*, Case No. C-80-0089-L(b) (W.D. Ky. Sept. 11, 1990), *aff'd sub nom. Halikas v. River Region Mental Health-Mental Retardation Bd., Inc.*, 667 F.2d 1026 (6th Cir. 1981), *cert denied*, 457 U.S. 1106 (1982).

The *Las Vegas Monorail* approach is instructive.  After applying the *Las Vegas Monorail* approach to the facts of this case, the Court concludes that Seven Counties is not a governmental unit.

### a.  Traditional Government Attributes

Seven Counties does not have traditional governmental attributes such as eminent domain, sovereign immunity, and taxing powers.  429 B.R. at 788.  KERS does not claim that Seven Counties has eminent domain powers.  (S.L.D.N. 6-1, PageID # 171)  As for sovereign immunity, Judge Lloyd deftly compared Seven Counties to a Kentucky Supreme Court case, *Comair, Inc. v. Lexington-Fayette Urban Cty. Airport Corp.*, 295 S.W. 3d 91, 99 (Ky. 2009), that addressed whether sovereign immunity extended to Lexington, Kentucky's airport.  (S.L.D.N. 6-1, PageID # 172)  From this analysis, she ultimately concluded that Seven Counties did not qualify for sovereign immunity.  (*Id.*)  KERS does not challenge her conclusion.  That leaves taxing powers as the lone governmental attribute that could apply to Seven Counties.

KERS argues that Seven Counties has the ability to tax.  (D.N. 15, PageID # 2129)  It relies on Ky. Rev. Stat. § 210.460(1).  That statute provides that when a CMHC board believes that the CMHC has not been appropriated enough funds for its needs, the CMHC may seek a special ad valorem tax.  In order for it to get that tax, though, the Cabinet must approve of the tax and the CMHC must request a fiscal court to assess it.  Of course, there is a difference between *requesting* a tax and assessing a tax.  Seven Counties must rely on both the Cabinet's approval and the fiscal courts in the counties it serves to assess and collect any tax dollars.  These significant limitations undercut the argument that Seven Counties has traditional government powers.  KERS also notes that Seven Counties "is 95% funded with government dollars, which come from tax revenues."  (D.N. 15, PageID # 2130)  Yet this argument also falls short.  Many

private entities—for example, medical practices whose patients are mostly insured by Medicaid or construction companies that specialize in building and maintaining public highways—depend largely on government dollars.  That alone does not make them governmental entities.  Without the ability to tax, Seven Counties is left without indicia of traditional governmental attributes.  This *Las Vegas Monorail* factor weakens the claim that Seven Counties is a governmental entity.

**b.  Level of State Control**

The second *Las Vegas Monorail* factor becomes relevant if Seven Counties reflects a public purpose.  That is, does Seven Counties "reflect goals and activities which augment the State's provision of some public function"?  *Las Vegas Monorail*, 429 B.R. at 789.  Seven Counties does have a public purpose: to provide behavioral and mental health services for the people who live in its service area.  With that in mind, the inquiry now becomes how much control Kentucky exercises over Seven Counties.  This analysis is important because there are many entities that have public purposes—like "the Red Cross and other charities"—that could not fairly be considered instrumentalities of government because the entities' functions are not controlled by government.  *Id*.  So the extent of government control matters.

The *type* of governmental control also matters.  If the government's control is meant to protect the government's finances or the public fisc, then the entity is an instrumentality of the government.  *Id*.  On the other hand, if the government's control "is more akin to oversight or regulation, then the entity is not an instrumentality."  *Id*. (citations omitted).

KERS argues that Kentucky exercises substantial control over Seven Counties.  (D.N. 15, PageID # 2130-31)  It lists as reasons the Cabinet's ability to impact Seven Counties' "structure, funding, budget and operations," and Seven Counties' reliance on state money.  (*Id*.)  It also points to the power of the Cabinet secretary to name a caretaker for CMHCs or even revoke

recognition of the CMHCs. (*Id*. at 2131) Still, consideration of these eventualities results in the conclusion that Kentucky's power over Seven Counties is limited to largely typical oversight and regulation.

As Judge Lloyd surmised, "[t]he great weight of evidence" shows Kentucky does not exercise the extent and type of control needed to make Seven Counties a governmental unit. (S.L.D.N. 6-1, PageID # 173) Seven Counties is a private, non-profit corporation. (*Id*.) No "agent or representative" of the state appoints Seven Counties' board of directors, or any of Seven Counties' officers, executives, or employees. (*Id*.) Moreover, Kentucky does not vet or approve Seven Counties' choices for its board of directors, its officers and executives, or its employees. (*Id*.) Seven Counties' employees do not work for the state and are not perceived as public employees. (*Id*., PageID # 173-74) The Cabinet's liaison to Seven Counties admitted at trial that he observes and reports on Seven Counties meetings, yet he has no control over them. (*Id*.) Indeed, he is often barred from Seven Counties' executive sessions. (*Id*.) The Cabinet has the authority to "de-designate" a CMHC, but de-designation would simply prevent Seven Counties from bidding on state contracts; de-designation would not in and of itself shutter Seven Counties. (*Id*., PageID #175) That is, the Cabinet cannot shut down Seven Counties or take away its corporate status. Besides, it appears that the power to de-designate is limited, and rarely used. (*Id*., PageID # 135) It is limited because, for example, the Cabinet must provide thirty days' notice and the target CMHC may request a hearing. (*Id*.) It is rare because, from the record, it appears that only two CMHCs—Seven Counties and Kentucky River Community Care, Inc.—became designated entities after some other entity lost its designation. (*Id*.) And nothing in the record suggests that the Cabinet or any other representative of Kentucky can "seize or exercise dominion" over Seven Counties' property. (*Id*., PageID # 175)

26

What about Seven Counties' finances?  KERS points out that 95% of Seven Counties' funding comes from the state.   (D.N. 115, PageID # 2090)  That is true, but only in the sense that Seven Counties *contracts* with the state to provide services.[8]  (S.L.D.N. 6-1, PageID # 175) That money does not come from direct appropriation of funds, the way that the General Assembly could directly appropriate funds to a state agency.  If Seven Counties received grant money from the state, it would have to submit a budget to the Cabinet showing how it spends the grant money.  (*See id*. at 174)  But even this would be more like oversight than anything else— Kentucky gives Seven Counties grant money for a specific purpose; its review of Seven Counties' budget is simply to ensure that the grant's purpose is adhered to.  (*See id*. (citations omitted))  And of course, there are other non-profits in Kentucky that receive grant money without damage to their corporate status.

Viewing these facts, Judge Lloyd found that Kentucky exercises even less control over Seven Counties' operations than did Nevada over the monorail corporation in *Las Vegas Monorail*.  (*Id*., at PageID # 173)  She was right.  Kentucky has but a "limited measure of public control, regulation, or oversight" over Seven Counties.  *See Las Vegas Monorail*, 429 B.R. at 786.  Because it lacks traditional government attributes and because Kentucky exercises only trivial control over it, Seven Counties is not a "governmental unit" under the Bankruptcy Code. And so, it thus far appears that Seven Counties qualifies for Chapter 11 relief.

**c.  How Kentucky Designates Seven Counties**

The final *Las Vegas Monorail* factor is an analysis of "the effect of the State's own designation and treatment of the entity."  429 B.R. at 788.  For this inquiry, "some deference" is given to Kentucky's "categorization of the entity."  *Id*. at 789.  This deference is not dispositive,

---

[8] And it is not as though Seven Counties is *required* to provide 95% of its services to the state.  It could, in theory, provide behavioral health services to others.

but it reflects the desire of Congress to give the states greater leeway.  *See id.*  This factor is not concerned with the label the state uses; rather, the analysis focuses on what the "label carries with it."  *Id.*

The evidence presented at trial indicates that Kentucky treats Seven Counties as a private entity.  Like in *Las Vegas Monorail*, Seven Counties must "obtain licenses and franchises just as if it were a purely private entity."  (S.L.D.N. 6-1, PageID # 136 (quoting 429 B.R. at 798))  Like other corporations, if Seven Counties does not update its annual reports with Kentucky's Secretary of State, its corporate status may be dissolved.  (*Id.*, (citing KY. REV. STAT. §§ 273.3671, 14A.6-010))  Again, it contracts with the state to provide services for a fee.  (*Id.* (citing 200 K.A.R. 5:309(1)(11) (2013)))  And though Seven Counties must comply with the Kentucky Open Records Act because the Commonwealth provides Seven Counties with at least 25% of its funds, Seven Counties is not subject to the Kentucky Open Meetings Act.  (*Id.*, at PageID # 137 (citing Ky. O.A.G. 02-ORD-222; Ky. O.A.G. 96-OMD-180 at *2))  These facts suggest that Kentucky treats Seven Counties as a private entity and not a governmental unit.

One possible hurdle remains.  KERS claims that Seven Counties counts as a "special purpose governmental entity" under Kentucky law.  (*See* D.N. 15, PageID # 2131-33; *see also* D.N. 23, PageID # 3789)  A special purpose governmental entity "exist[s] to serve a public purpose and must be subject to standards of accountability so that the public, other local governmental entities, and state government can be apprised of the their status and activities."  (D.N. 15, PageID # 2131 (quoting 2013 Ky. Acts ch. 40, sec. 1(8)(a)-(c)))

Judge Lloyd determined that Seven Counties is not a special purpose governmental entity.  She cited several reasons, (S.L.D.N., PageID # 137-38), but the Court will recite only a few.  First, she noted that Seven Counties fails one requirement because it is not an "agency,

authority, or entity created or authorized by statute." (*Id*., at PageID # 137 (quoting Ky. Rev. Stat. § 65A.10(9)(a)))  She also decided that Seven Counties was a private entity under the statute, such that it could not be a governmental entity. (*Id*., at PageID # 138 (citing KY. REV. STAT. § 65A.010(9)(d)))  The relevant portion of the statute defines "private entity" as "any entity whose sole source of public funds is from payments pursuant to a contract with a city, county, or special purpose governmental entity, including funds received as a grant or as a result of a competitively bid procurement process." KY. REV. STAT. § 65A.010(6)(a).  Judge Lloyd reasoned that, though a technical reading might hold that Seven Counties is not a private entity because it receives public funding from the state and federal governments (and not just cities, counties, or special purpose governmental entities), such a reading would be "absurd." (S.L.D.N. 6-1, PageID # 138)

KERS tried to parry these conclusions and prove that Seven Counties is a special purpose governmental entity. Even if it is right, though, the Court doubts it would make much difference. Again, the label itself is not what matters—what matters is what comes with the labels. *Las Vegas Monorail*, 429 B.R. at 789.  As Seven Counties noted, the statute only obliges special purpose governmental entities to submit reports to state government. (D.N. 19, PageID # 2982 (citing KY. REV. STAT. § 65A.020))  To the Court, this relatively minor requirement cannot be applied to overcome the other, more significant attributes which collectively and overwhelmingly suggest that Kentucky recognizes and treats Seven Counties as a private entity. For this reason, as well as the reasons discussed above, the Court must conclude that Seven Counties is eligible for Chapter 11 relief.

**2.  An Executory Contract Exists Between Seven Counties and KERS**

Seven Counties argued to the bankruptcy court that an executory contract exists between it and KERS, and that 11 U.S.C. § 365 allows the contract to be rejected.  (S.L.D.N. 6-1, PageID # 185)  To determine whether this is correct, the Court must follow a two-step inquiry: (1) is there a contract between KERS and Seven Counties; and (2) is that contract "executory"?  The bankruptcy court answered yes to both those questions.  (*See id.*, PageID # 186-94)  The Court agrees with both conclusions.

**a.  The Relationship Between Seven Counties and KERS Is Contractual**

"Whether or not a contract exists between [Seven Counties] and KERS is a matter of state law."  (*Id.*, PageID # 186 (citing *Butner v. United States*, 440 U.S. 48, 54 (1979))  Under Kentucky law, contracts must have "offer and acceptance, full and complete terms, and consideration."  *Collins v. Ky. Lottery Corp.*, 399 S.W.3d 449, 455 (Ky. Ct. App. 2012) (citation omitted).  Here, each requirement is met.

An offer requires "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."  RESTATEMENT (SECOND) OF CONTRACTS § 24 (1981).  In 1979, Seven Counties made a written offer to join KERS—to pay employee "pick ups" if KERS would let Seven Counties' employees be in the pension system.  (S.L.D.N. 6-1, PageID # 186; *see also* D.N. 19, PageID # 2988)  Kentucky's attorney general considered the offer and advised Kentucky's governor to accept it.  (S.L.D.N. 6-1, PageID # 187 (citing Ky. O.A.G. 78-685)))  Acceptance is a "manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer."  RESTATEMENT § 50.  KERS assented to the proposal when Kentucky Governor Julian Carroll issued Executive Order 79-78, which allowed Seven Counties to participate in

KERS, on January 24, 1979.  (*See* S.L.D.N. 6-1, PageID # 187)  The terms of the contract are detailed extensively in the statutes and regulations governing KERS.  And both sides received consideration for entering into the contract.  Kentucky courts have defined consideration as

> A benefit conferred to a promisor or a detriment incurred by a promisee.  A benefit occurs when the promisor, in exchange for a promise, obtains a legal right to which he was not otherwise entitled.  A detriment occurs when the promisee, in exchange for the promise, waives a right to which he was otherwise entitled to exercise.

*Martin v. Pack's Inc.*, 358 S.W.3d 481, 484 (Ky. Ct. App. 2011) (citations omitted).  Moreover, "[t]he performance or return promise may be given to the promisor or to some other person." RESTATEMENT § 71(4).  In this case, each side gained benefit in exchange for detriment.  Seven Counties took on a detriment because it agreed to pay into KERS, something it was previously not required to do.  In exchange, it benefitted because its employees were then covered under Kentucky's pension system.  KERS took on a detriment because, once Seven Counties entered the system, it became liable for paying the benefits of Seven Counties retirees.  Wider participation also benefitted KERS.  With all this in mind, the Court concludes that a contract exists between these two entities.

KERS challenges this conclusion on multiple grounds.  The Court will address the arguments in turn.

First, KERS protests that there was no written or oral contract between it and Seven Counties.  (D.N. 15, PageID # 2097-01)  Its argument is really that the relationship is governed by statute, not contract, as evidenced by the inability of Seven Counties to produce a written document styled as a contract.  This view misses the point.  The holding below, and of this Court, is that the statutes governing the relationship between the two comprise the terms of the contract.  After all,

the incorporation of applicable existing law into a contract does not require a deliberate expression by the parties. . . . [T]he parties to a contract—including the government, in a contract between the government and a private party—are presumed or deemed to have contracted with reference to existing principles of law.

Under this presumption of incorporation, valid applicable laws existing at the time of the making of a contract enter into and form a part of the contract as fully as if expressly incorporated in the contract.

11 *Williston on Contracts* § 30:19 (4th ed. 2015).  At the time of offer and acceptance, the statutes governing KERS existed.  Thus, those statutes were incorporated into the agreement between KERS and Seven Counties.  *See id.*  And so, the terms of the contract *are* in writing—they existed in Kentucky's statutes before Seven Counties even began participating in the system.  With the terms secure, all that was needed for Seven Counties to contract with KERS was an offer to participate in the program and an acceptance of that offer.

Regardless, KERS's argument that Ky. Rev. Stat. § 45A.245(1) requires contracts with the Commonwealth to be in writing is unavailing.  As Judge Lloyd correctly surmised, that statute is meant to prevent an inadvertent waiver of Kentucky's sovereign immunity from breach of contract damages.  (S.L.D.N. 6-1, PageID # 190-91)  As this is not a case for breach of contract damages, the statute is inapplicable.  Moreover, the Kentucky Court of Appeals has found that parties had contracts with the Commonwealth and could pursue certain forms of relief even without a written contract.  *See, e.g., Newton v. Univ. of Louisville*, 2009-CA-002197-MR, 2010 WL 4366360, at *4 (Ky. Ct. App. Nov. 5, 2010) (finding contract with state based on an employment handbook).[9]

---

[9] While the Court recognizes that unpublished decisions of the Kentucky Court of Appeals are not binding, it finds the court's conclusion in *Newton* illustrative.

Second, KERS says that there was no statutory authority for Seven Counties to contract with KERS.  (*Id.*, PageID # 2101-05)  Frankly, this argument seems to contradict itself.  KERS admits that the "General Assembly delegated [the authority to permit employers to participate in KERS] to the Governor to be exercised by the executive order process."  (*Id.*, PageID # 2102)  Despite this admission, KERS then says that the non-delegation doctrine—the concept that the powers of administrative agencies are "limited to those conferred expressly by statute or exist by necessary and fair implication"[10]—prohibits an entity like Seven Counties from reaching an agreement to participate in KERS.  (*Id.*)  These two positions are incompatible.  If the General Assembly ceded to the executive branch the authority to offer new employers entry into the system, why would the non-delegation doctrine bar Seven Counties from accepting the offer?

Third, KERS argues that Governor Carroll could not enter into a contract on behalf of KERS.  (*Id.*, PageID #2105-07)  Instead, Governor Carroll was only authorized to issue executive orders allowing employers to participate.  (*Id.*, PageID # 2106)  The problem with KERS's position is that it implies Governor Carroll either assented to a contract or issued an executive order, but not both.  Judge Lloyd's opinion, however, rests on the implicit assumption that Governor Carroll assented to the offer *by* issuing the executive order.  As stated above, the General Assembly gave Governor Carroll the authority to extend participation in the system to non-profits.  The Court sees no reason—in law or common sense—to say that his issuance of an executive order allowing Seven Counties to participate in the system was not the functional equivalent of assenting to a contractual arrangement.

KERS's fourth contention is that KERS received no consideration.  (*Id.*, PageID # 2107-08)  For the reasons discussed above, this too is inaccurate.  KERS received benefits—it received

---

[10] *Baker v. Commonwealth of Ky.*, No. 2005-CA-001588-MR, 2007 WL 3037718, at *34 (Ky. Ct. App. Oct. 19, 2007) (internal citations omitted).

employer pick-ups from Seven Counties, and the addition of a new employer spread risk within the system.  This satisfies the consideration requirement.

Finally, KERS argues that a contract between Seven Counties and KERS "violates Ky. Rev. Stat. §§ 61.510(3) and 61.520(1) and is therefore void."  (*Id*., PageID# 2108)  KERS makes no attempt to prove that the contract between Seven Counties and KERS violates those statutes, however.  And the Court sees no reason why those provisions—one saying that CMHCs admitted to participate will count as "departments" and the other that the governor has authority to admit employers to the system—would void any agreement between the two entities.

### b.  The Contract Between the Two Is Executory

With a contract in hand, the inquiry becomes whether that contract is executory.  But just as the Bankruptcy Code avoids defining "governmental unit," it likewise does not define "executory contract."  (S.L.D.N. 6-1, PageID # 191 (citing *Chattanooga Mem'l Park v. Still (In re Jolly)*, 574 F.2d 349 (6th Cir. 1978)))  Perhaps the omission is intentional.  In *Chattanooga Memorial Park*, the Sixth Circuit opened its discussion with the observation that "the phrase ["executory contract"] is meaningless."  574 F.2d at 350.  It then cited the oft-used definition that an executory contract is one where "the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other."  *Id*. at 351 (quoting Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973)). The Sixth Circuit concluded that the definition was helpful but not conclusive.  *Id*.

Instead, the Sixth Circuit determined that the "key . . . is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish."  *Id*.  If those objectives cannot be accomplished with rejection or if they are already accomplished, "then the

34

contract is not executory within the meaning of the Bankruptcy Act." *Id*.  This reflects the reality that "executory contracts involve obligations which continue into the future."   *Id*. (citation omitted).  That is, "[g]enerally they are agreements which include an obligation for the debtor to do something in the future."  *Id*.

Under either the Countryman approach or the more functional analyis that the Sixth Circuit applied in *In re Jolly* and the bankruptcy court used below, the contract between Seven Counties and KERS is executory.  The contract is executory under the *In re Jolly* approach because Seven Counties "has the continuing future obligation" to contribute to KERS.  (S.L.D.N. 6-1, PageID # 193)  But if it is forced to pay those obligations, Seven Counties will cease operations.  The purpose of rejection, then, is to relieve Seven Counties of onerous contractual obligations that will drive it out of business.  Seven Counties could achieve that purpose by rejecting this contract, which means the contract is executory.  (*Id*.)

The Countryman approach is also satisfied.  Each side to this contract still has continuing obligations.  Seven Counties must keep making contributions.  KERS must keep managing the pension portfolio for Seven Counties employees and paying benefits once the employees retire. KERS takes issue with this, saying that these are obligations owed to employees and not employers like Seven Counties.  (D.N. 15, PageID # 2120)  But it is well established that consideration for a contract can require that "[t]he performance or return promise may be given to the promisor *or to some other person*."  Restatement § 71(4) (emphasis added).  If obligations owed to some third party can count for consideration, there is no reason why unperformed obligations to third parties would somehow preclude finding an executory contract.  The Court concludes that this is an executory contract that Seven Counties may reject under 11 U.S.C. § 365.

### 3. Seven Counties Is Not Required to Continue Post-Petition Obligations

The last issue to address here is one the bankruptcy court addressed early in its opinion: whether 28 U.S.C. § 959(b)—which essentially says that trusts, receivers, or managers in bankruptcy must continue to comply with state laws in their use of the bankrupt entity's assets—supersedes Seven Counties' ability to reject its executory contract with KERS. (*See* S.L.D.N. 6-1, PageID # 177-85) This issue springs from KERS's complaint, where it asked for a permanent injunction to force Seven Counties to comply with its "Statutory Obligations" under Kentucky law. (*Id.*, PageID # 177) That is, KERS wanted Seven Counties to keep withholding its employee "pick up" deductions and to pay all scheduled contributions. (*Id.*) At the same time, of course, Seven Counties sought to reject its executory contract with KERS. Though the two issues were legally distinct, the bankruptcy court logically decided to deal with them together. (*Id.*) The Court agrees. Seven Counties is not required to make any post-petition contributions.

The Court notes that the bankruptcy court also addressed the question of whether 11 U.S.C. § 363(d)(1)—which allows a trustee to sell or lease a bankrupt entity's property so long as the transactions comply with laws outside the Bankruptcy Code—could require Seven Counties to keep participating in the system. (*Id.*, PageID # 178) KERS argued that it did. (*Id.*) Judge Lloyd carefully detailed why that portion of the Bankruptcy Code did not apply to or affect this case. (*Id.*) As neither side challenges that decision, and because the Court concludes Judge Lloyd's analysis was correct, the Court will not scrutinize the conclusion further.

Turning now to 28 U.S.C. § 959(b), this portion of the Bankruptcy Code requires that a debtor "manage and operate property post-petition per valid state laws where the property is located." (*Id.*, PageID # 179 (where the bankruptcy court offers a plain language interpretation of the relevant Bankruptcy Code language)) The point here is that Congress did not intend for

the Bankruptcy Code to preempt all state laws and wanted to keep trustees from "insulating themselves by using the federal courts to circumvent compliance with state laws."  Robert C. Furr, *Trustee's Obligation to Comply with State Law*, AM. BANKR. INST. J. 30, 42 (2011).

KERS contends that state laws that give structure to the arrangement between KERS and Seven Counties are the types of state laws requiring compliance from bankruptcy debtors.  (*Id*., PageID # 2122-24)  And it points to a case, *City of West Jordan v. Utah State Retirement Board*, 767 P.2d 530, 534 (Utah 1988), for the proposition that a state has a legitimate interest in determining a minimum amount of retirement benefits that must be provided to "public employees by its political subdivisions."  (*Id*., PageID # 2123)  Last, KERS pleads for the Court to reverse the bankruptcy court's decision in order to protect the general welfare of the retirees who rely on state pensions.  (*Id*., PageID # 2124)

The courts that have addressed these issues have decided that the types of state laws debtors must continue to comply with are those relating to health, safety, and welfare.  For example, courts have forced debtors to continue complying with laws protecting the environment from toxic pollution, to continue complying with local zoning requirements, and to adhere to liquor licensing rules.  (S.L.D.N 6-1, PageID # 179 (citations omitted))  As Judge Lloyd concluded, the cases relate to areas where the state has broad police power to protect the health and well-being of its citizens.  (*Id*.)  Significantly, no court has ever ruled that laws relating to retirement benefit plans are included.  (*Id*.)  The case that KERS points to, *City of West Jordan*, is readily distinguishable.  *West Jordan* dealt with a city trying to withdraw from a state pension system.  Of course, Kentucky does have a legitimate interest in setting and providing retirement benefits for its public employees, and it does have a legitimate interest in ensuring its political subdivisions contribute their fair share to those systems.  But this case does not relate to public

employees.   And, despite what label Kentucky gives it, Seven Counties does not count as a political subdivision under the Bankruptcy Code.   The Court does not equate the situation presented here with the other cases where courts have found that § 959(b) required a debtor to continue state obligations.   To the extent, though, that there might be an overlap where Kentucky's law somehow conflicts, "state law must yield." (*Id.*, PageID # 180 (citing *Saravia v. 1736 18th Street N.W., L.P.*, 844 F.2d 823, 826 (D.C. Cir. 1988)))

The laws governing Kentucky's retirement system are not the types of health, safety, and welfare laws courts have previously required debtors to comply with under § 959(b).   The Court recognizes, however, that the distant final resolution of this case may one day contribute to further difficulties for KERS, and perhaps its participants.   Yet this concern cannot alter the conclusion that Seven Counties' obligations to KERS were effectively severed when it sought bankruptcy protection.   The Bankruptcy Code does not require Seven Counties to fulfill any post-petition obligations to KERS.

## IV.   CONCLUSION

After de novo review, the Court concludes that the bankruptcy court reached the correct legal conclusions.   Accordingly, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

1.   Appellant KERS's motion to certify a question to the Kentucky Supreme Court (D.N. 25) is **DENIED**.

2.   The bankruptcy court's conclusion that the Kentucky Employee Retirement System's non-hazardous plan is a "multi-employer plan" is **REVERSED** as clear error. Instead, the record shall reflect that the plan is actually a "multiple-employer plan."

3.   In all other respects, the bankruptcy court's decision is **AFFIRMED**.

38

    4.   The cross-appeal of Seven Counties is **DENIED** as moot and **DISMISSED**.

March 31, 2016

**David J. Hale, Judge**
**United States District Court**

cc:    Clerk of Court, United States Bankruptcy Court for the Western District of Kentucky